## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>DNIB UNWIND, INC.<br>(f/k/a BIND THERAPEUTICS, INC.),<br><br>               Post-Effective Date Debtor. | Chapter 11<br><br>Bankruptcy Case No. 16-11084 (BLS)<br>Adv. Proc. No. 17-50882 (BLS) |
| B.E. CAPITAL MANAGEMENT FUND LP,<br>on behalf of itself and all others similarly<br>situated,<br><br>               Appellant,<br><br>v.<br><br>GEOFFREY L. BERMAN, in his capacity as<br>Trustee of the Liquidating Trust of DNIB<br>Unwind, Inc. (f/k/a Bind Therapeutics, Inc.),<br><br>               Appellee. | Case No. 17-945-GMS |

**APPELLANT'S OPENING BRIEF IN SUPPORT OF APPEAL FROM THE
MEMORANDUM ORDER DENYING B.E. CAPITAL MANAGEMENT FUND LP'S
MOTION FOR DETERMINATION THAT THE TRUSTEE'S CONDITIONING OF
DISTRIBUTIONS TO SHAREHOLDERS ON THEIR SUBMISSION OF EQUITY
DISTRIBUTION FORM VIOLATES THE PLAN, OR ALTERNATIVELY,
IS AN IMPERMISSIBLE PLAN MODIFICATION**

KLEIN LLC
Julia B. Klein (DE 5198)
919 North Market Street
Suite 600
Wilmington, Delaware 19801
(302) 438-0456
klein@kleinllc.com

*Counsel for B.E. Capital Management
Fund LP and the Putative Class*

Dated: August 28, 2017

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. Bankr. P. 8012 and Fed. R. App. P. 26.1 and 28(a)(1), B.E. Capital Management Fund, LP ("<u>B.E. Capital</u>") states that it is not a corporate party.

## TABLE OF CONTENTS

BASIS OF APPELLATE JURISDICTION.................................................................... 1

STATEMENT OF ISSUE............................................................................................ 1

STANDARD OF REVIEW ......................................................................................... 1

STATEMENT OF THE CASE..................................................................................... 2

    A.   Nature and Course of Proceedings...................................................................... 2

    B.   Statement of Facts.............................................................................................. 3

SUMMARY OF THE ARGUMENT ........................................................................... 6

ARGUMENT ............................................................................................................. 7

    I.    THE BANKRUPTCY COURT ERRED, AS A MATTER OF LAW, IN HOLDING
THAT THE PLAN, THE CONFIRMATION ORDER AND THE TRUST AGREEMENT
ALL OPERATE TO PROVIDE THE TRUSTEE WITH THE AUTHORITY TO DEMAND
THE TAX FORMS AND THE CERTIFICATIONS ............................................. 7

        A.   The Confirmation Order Provides No Authority for the Trustee's Requirement of the
Tax Forms or Certifications .................................................................. 7

        B.   Article XVI.J of the Plan Provides no Authority for the Trustee to Request the Tax
Forms Because there are Alternatives to the Trustee's Tax Reporting Method ..................... 8

        C.   Section 4.1(f) of the Liquidating Trust Agreement Does Not Provide the Trustee with
Authority to Demand the Tax Forms and Certifications Because the Trustee is Not
Withholding Taxes.............................................................................. 11

        D.   Interpreting Operative Plan Documents as Authorizing the Trustee to Condition
Distributions to Holders of DNIB Stock in Street Name on Tax Documents and
Certifications Would Render the Provisions in those Documents Relating to the Debtor's
Transfer Agent Meaningless ................................................................ 12

CONCLUSION....................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*8 E. Frederick Place, LLC v. Flintkote Co.* (*In re The Flintkote Co.*), 533 B.R. 887 (D. Del. 2015) ........................................................................................................................... 1

*Catlin v. United States*, 324 U.S. 229 (1945) .................................................................... 1

*Coca-Cola Bottling Co. v. Coca-Cola Co.*, 769 F. Supp. 671 (D. Del. 1991) .................. 9, 10, 15

*In re AMR Corp.*, 562 B.R. 20 (Bankr. S.D.N.Y. 2016) .................................................... 13

*In re Cont'l Airlines*, 150 B.R. 334 (D. Del. 1993) ........................................................... 1

*Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 56 A.3d 1072 (Del. Ch. 2012) .......... 14

*O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281 (Del. 2001) ......................................... 14

*Pac. Emplrs. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417 (3d Cir. 2012) ............ 13

*Schlumberger Res. Mgmt. Servs., Inc. v. CellNet Data Sys., Inc.* (*In re CellNet Data Sys., Inc.*), 327 F.3d 242 (3d Cir. 2003) .......................................................................................... 1

**Statutes**

26 U.S.C. § 3406 .............................................................................................................. 10

26 U.S.C. §§ 331-34 ......................................................................................................... 10

**Treatises**

4 *Williston on Contracts* § 618 ......................................................................................... 9

Restatement (Second) of Contracts, § 202(1) (1981) ...................................................... 14

Restatement (Second) of Contracts, § 202(2) (1981) ...................................................... 13

**Regulations**

26 C.F.R. § 1.671-4(b)(3) ................................................................................................ 12

26 CFR §§ 1.671-4 ........................................................................................................... 10

**IRS Publications**

IRS Publication 550 ......................................................................................................... 10

i

## BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 158(a)(1), which gives the Court authority to hear appeals "from final judgments, orders, and decrees."

On July 13, 2017, the Bankruptcy Court entered the Memorandum Order [Bankr. D.I. 694] (the "Mem. Op."). The Mem. Op. is a final order in that it disposes of all parties' claims. *See Catlin v. United States*, 324 U.S. 229, 233-34 (1945) (a final judgment is one that "ends the litigation on the merits and leaves nothing for the court to do.").

## STATEMENT OF ISSUE

Did the Bankruptcy Court err, as a matter of law, that "the Plan, the Confirmation Order and the Trust Agreement all operate to provide the Trustee with the authority to demand the tax forms and the Certifications"?

## STANDARD OF REVIEW

The Bankruptcy Court's conclusions of law are subject to plenary review. *Schlumberger Res. Mgmt. Servs., Inc. v. CellNet Data Sys., Inc.* (*In re CellNet Data Sys., Inc.*), 327 F.3d 242, 244 (3d Cir. 2003); *also see In re Cont'l Airlines*, 150 B.R. 334, 336 (D. Del. 1993) ("Legal conclusions of the bankruptcy court are subject to plenary review by the district court and are considered *de novo* on appeal."). Findings of fact will be reversed when they are found to be clearly erroneous. *Id.*; *see 8 E. Frederick Place, LLC v. Flintkote Co.* (*In re The Flintkote Co.*), 533 B.R. 887, 891 (D. Del. 2015) (appellate court reviews "findings of fact for clear error"). Mixed questions of law and fact are reviewed under a "mixed standard, affording a clearly erroneous standard to integral facts, but exercising plenary review of the lower court's interpretation and application of those facts to legal precepts." *CellNet Data Sys.*, 327 F.3d at 244 (internal citation omitted).

## STATEMENT OF THE CASE

### A.   Nature and Course of Proceedings

DNIB Unwind, Inc. (f/k/a BIND Therapeutics) (the "Debtor" or "DNIB") was a pharmaceutical company with its principal place of business in Boston, MA.  For reasons not relevant hereto, the Debtors[1] filed for protection under chapter 11 of the Bankruptcy Code on May 2, 2016.

On July 27, 2016, the Bankruptcy Court entered an order approving the sale of substantially all of the Debtors' assets to Pfizer for $40 million.

On August 1, the Debtors engaged Geoffrey Berman (the "Trustee") as their Chief Restructuring Officer.

On August 15, the Debtors proposed their initial combined disclosure statement and plan (as amended, the "Plan") [D.I. 415].  On September 26, the Bankruptcy Court confirmed the Plan (the "Confirmation Order") [D.I. 457].  The Plan became effective on October 11, 2016 (the "Effective Date") and the Trustee, pursuant to the Liquidating Trust Agreement approved by the Plan, succeeded the Debtors in implementing the Plan and Confirmation Order.

On December 15, 2016, the Trustee, pursuant to the Plan, made an Initial Equity Distribution to equity holders who held DNIB stock as of August 30, 2016 (the "Distribution Record Date").  Plan VIII.A.6(d); Confirmation Order ¶ 20.

On February 13, 2017, the Trustee's noticing agent filed an affidavit of service with the Bankruptcy Court [D.I. 590] attaching a notice to equity interest holders (the "Shareholder Notice") that that no further distributions will be made to any Distribution Record Date shareholder

---

[1]     The chapter 11 cases were filed on behalf of the Debtor and a related entity.  Their cases were administratively consolidated under Case No. 16-11084 (BLS), and the related entity was dissolved pursuant to the Plan. The terms Debtor and Debtors in this brief are used interchangeably. All docket entries ("D.I.") referenced herein are to the Debtors' Bankruptcy Court chapter 11 cases.

that does not return a completed W-9 and a certification by its nominee (the "Equity Distribution Form") by August 7, 2017.

On March 22, 2017, B.E. Capital filed its *Motion for Determination that the Trustee's Conditioning of Distributions to Shareholders on their Submission of Equity Distribution Form Violates the Plan, or Alternatively, is an Impermissible Plan Modification* [D.I. 615] (the "Motion"), asserting that the provisions contained in the Shareholder Notice violate the Debtors' Plan or, in the alternative, constitute an impermissible post-confirmation Plan modification.

The Trustee opposed the Motion on March 27 (the "Opp.") [D.I. 627], to which B.E. Capital responded on May 24 (the "Reply") [D.I. 661]. A hearing to consider the Motion was held on May 31, 2017.[2]

On July 13, 2017, the Bankruptcy Court denied the Motion. On July 14, B.E. Capital appealed the decision to this Court, and this is its opening brief.

**B.      Statement of Facts**

At the time the Debtors filed for protection under chapter 11 of the Bankruptcy Code on May 2, 2016, DNIB stock traded over the counter ("OTC") under the ticker symbol BIND. Plan II.1.A. The OTC securities continued to trade publicly until the Plan became effective on December 11, 2016. *Id.* VIII.A.6.(d). B.E. Capital, through its broker, purchased DNIB stock and is a Class 6-BIND Equity Interest holder entitled to "receive an Initial Equity Distribution on the Initial Equity Distribution Date in accordance with the terms of this Combined Plan and Disclosure Statement" under the Plan, because it held those shares on the Distribution Record Date. Plan VIII.A.6.

---

[2]      Citations to the transcript of the May 31 hearing appear as "Hr'g Tr. ___"

The Debtor's stock continued to trade over the counter for more than three months after the Distribution Record Date when, in accordance with the Plan and Confirmation Order, the Debtors' shares were canceled on the Effective Date.[3]

The Initial Equity Distribution on December 15, 2016 was made in accordance with the Plan and Liquidating Trust agreement.  With respect to shareholders who did not hold DNIB stock directly, but though brokers and nominees, this meant that the distribution was made, not directly to them but indirectly, through the Debtor's transfer agent and the Depository Trust Company. That is, the Trustee distributed the aggregate amount of funds due to such shareholders to the transfer agent and the DTC, which then sent it on to the brokerages and nominees that, in turn, deposited the funds into the shareholders' accounts.  Transactions involving public securities are intended to be precisely this computerized, fast, anonymous, and smooth as the Initial Equity Distribution.

On February 13, 2017, the Trustee filed the certificate of service of the Shareholder Notice. The Shareholder Notice represented to DNIB shareholders that the Trustee needed these forms to complete K-1 Schedules (which require TINs).  The Shareholder Notice provides, in relevant part:

> <u>In order to receive any further distribution(s) under the Plan</u> and your annual Form K-1, you must [c]oordinate completion of the enclosed Nominee Certification with your Nominee … and [s]end … the completed Nominee Certification to [address].
>
> [. . .]
>
> *Please coordinate completion of the below by your nominee if you hold the shares through a nominee.*
>
> Nominee Certification.  <u>In order to receive further distribution(s) under the Plan</u> and your annual Form K-1, your ownership of the

---

[3]     Confirmation Order ¶ 15 ("On the Effective Date, except for purposes of evidencing a right to receive a Distribution pursuant to the Plan and the Distribution Record Date contained therein, any … Equity Interests in BIND … shall be deemed cancelled."); Plan VIII.A.6(d) ("On the Effective Date, all BIND Equity Interests shall be canceled.").

shares (CUSIP 05548N 107) must be confirmed by your nominee, which nominee must complete the below on your behalf.

| To be completed by Nominee only | |
|---|---|
| DTC Participant Name: | **Number of Shares of CUSIP 05548N 107 that was held by Nominee for account indicated below as of August 30, 2016:** |
| DTC Participant Number: | |
| DTC Participant Contact Name: | |
| DTC Participant Authorized Signature: | |
| DTC Participant Contact Number: | **Nominee's Medallion Guarantee (or attach authorized signatory list hereto):** |
| DTC Participant Email Address: | |
| Beneficial Holder Name: | |
| Beneficial Holder Account Number: | |

In the Motion, B.E. Capital pointed out that the Trustee does not need to provide shareholders with K-1 Schedules, because the Plan intends for the Trust to qualify as a grantor trust, and argued the Trustee did not need shareholders' W-9/TIN to prepare grantor letters (which do not set forth the shareholders' TIN, but that of the Trust).[4] The Motion also contends that the Trustee's attempt to condition future Plan distributions on receipt of a completed Equity Distribution Form violates the Plan.

In its April 5 Opp., the Trustee announced that any future Plan distributions to shareholders would not be made through the Debtor's transfer agent and DTC like the Initial Equity

---

[4] The Trustee ultimately agreed, thereby dispelling the original justification for requesting W-9 Forms. *See* April 13 Letter, p. 2 n.2 [Bankr. D.I. 634] ("While the Trust's accountant originally characterized such forms as 'K-1 reports', the accountant has since clarified that the required tax forms are actually 'grantor letters.'"); *Status Report* [Bankr. D.I. 642], ¶ 4 n.3. ("the Trust's accountant initially mistakenly referred to such reports as "K-1 reports", but has since confirmed that each beneficiary of the Trust will receive a "grantor letter" instead.").

Distribution.  Rather, the Trustee will be making future distributions himself, based on the information provided by shareholders on the Equity Distribution Form.  Opp. ¶ 2.

B.E. Capital responded that the Trustee's manual distribution mechanism also violates the Plan, which requires that distribution to holders of DNIB stock in street name be made through the Debtor's transfer agent.  Reply ¶ 1.

The Bankruptcy Court held that the Confirmation Order, the Plan, and Liquidating Trust Agreement all permit the Trustee to condition future distributions on receipt of a W-9 and the Equity Distribution Form.  Mem. Op. ¶ 7.

## SUMMARY OF THE ARGUMENT

The Mem. Op. should be reversed because its legal conclusion it not supported by provisions in the operative Plan documents upon which the Bankruptcy Court relied.

First, paragraph 3 of the Confirmation Order does not serve as basis of authority for the Trustee; it simply makes a finding that the Plan was entered into in good faith.

Second, Article XVI.J of the Plan does not authorize the Trustee to request Tax Documents where such forms, as here, are not required for the Trustee to meet withholding or tax reporting requirements.  The existence of alternative reporting methods makes Article XVI.J inapplicable.

Third, section 4.1(f) of the Liquidating Trust Agreement does not authorize the Trustee's tax form and certification demands because that section only relates to the Trustee's tax withholding obligations and the Trustee cannot, and will not, withhold taxes from distributions to shareholders.

Finally, the Bankruptcy Court's interpretation of the provisions in the Plan documents upon which it relied does not comport with established contract interpretation and construction principles.  Its legal conclusion results in rendering meaningless all provisions in those documents

relating to the Debtor's transfer agent and are inconsistent with the intent of the parties at the time the Plan was proposed and confirmed.

## ARGUMENT

I. **THE BANKRUPTCY COURT ERRED, AS A MATTER OF LAW, IN HOLDING THAT THE PLAN, THE CONFIRMATION ORDER AND THE TRUST AGREEMENT ALL OPERATE TO PROVIDE THE TRUSTEE WITH THE AUTHORITY TO DEMAND THE TAX FORMS AND THE CERTIFICATIONS**

### A. The Confirmation Order Provides No Authority for the Trustee's Requirement of the Tax Forms or Certifications

The Bankruptcy Court's conclusion is erroneous because the Confirmation Order provides no authority for the Trustee to request any tax documents or an Equity Distribution Form.

The Bankruptcy Court's holding is based, in part, on paragraph 3 of the Confirmation Order. Mem. Op. ¶ 7 ("As noted [in ¶ 5] above, the Plan, Confirmation Order and the Trust Agreement all operate to provide the Trustee with the authority to demand the tax forms and the Certifications."). That referenced paragraph 3, however, is not what paragraph 5 of the Mem. Op. quotes it to be and does not concern the Trustee.

Paragraph 3 of the Confirmation Order provides as follows:

> Compromise of Controversies. For the reasons stated herein, the Plan constitutes a good faith, arm's length compromise and settlement of all Claims or controversies relating to the rights that a Holder of a Claim or Equity Interest, or any assignees thereof, may have with respect to any Allowed Claim or Equity Interest or any Distribution to be made or obligation to be incurred pursuant to the Plan, and the entry of this Confirmation Order constitutes approval of all such compromises and settlements. For the avoidance of doubt, the Debtors are required to make all required withholding payments and apply with all applicable tax laws with respect to the Distributions.

Paragraph 3 of the Confirmation Order does not operate to provide the Trustee with any authority, for two main reasons: First, the Trustee is nowhere mentioned in this provision. This

makes sense, because it relates to creditors, at Plan confirmation, giving up their claims against the Debtors in exchange for distributions from the estate as set forth in the Plan—a bargained-for exchange between the creditors and the Debtors.  Paragraph 3 constitutes the finding of the Bankruptcy Court that such compromise was achieved in "good faith."  This finding cannot pertain to the Trustee, because he was not appointed until several months later, when the Plan became effective and, consequently, was not involved in the compromise.

Second, paragraph 3 provides no source of authority for any party, including the Trustee. It is a garden-variety "good faith" clause contained in virtually every confirmation order.  At best, the second sentence of paragraph 3 imposes an obligation on the Debtors ("the Debtors are required to"), entities legally distinct from the Trustee.  However, it does not provide for an affirmative right.  *Cf.* Plan XVI.J (quoted in ¶ 5) ("The Debtors and the Post-confirmation Liquidating Trustee have the right, but not the obligation . . .").

**B.  Article XVI.J of the Plan Provides no Authority for the Trustee to Request the Tax Forms Because there are Alternatives to the Trustee's Tax Reporting Method**

The Bankruptcy Court held that "BEC may be correct that there are other avenues available to the Trustee[,]" Mem. Op. ¶ 8, but nevertheless approved the "Trustee's documentation requests[.]" *Id*.  This holding is erroneous because, if there are alternatives to the Trustee's reporting methods, Article XVI.J, the Plan provision upon which the Mem. Op. relies, provides no authority for the Trustee to demand W-9 Forms from OTC shareholders.

The excerpt of Article XVI.J quoted in the Mem. Op., standing on its own, appears to accord the Trustee blanket authority to condition distributions on the receipt of completed W-9 Forms.  But, when applying the fundamental principle of contract construction and interpretation

that "[t]he meaning of words is dependent upon their context,"[5] it becomes clear that this is not the case.

Article XVI.J provides, in its entirety:

### J.    Withholding and Reporting Requirements

In connection with the consummation of the Combined Plan and Disclosure Statement, the Debtors and Post-confirmation Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim or Allowed Equity Interest that is to receive a Distribution under the Combined Plan and Disclosure Statement shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution. The Debtors and the Post-confirmation Liquidating Trustee have the right, but not the obligation, to not make a Distribution until such Holder has made arrangements satisfactory to any disbursing party for payment of any such tax obligations. The Debtors or Post-confirmation Liquidating Trustee may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim or Allowed Equity Interest complete and return a Form W-8 or W-9, as applicable to each such Holder. If the Debtors or Post-confirmation Liquidating Trustee make such a request and the Holder fails to comply before the date that is 180 days after the request is made, the amount of such Distribution shall irrevocably revert to the Debtors or the Post-confirmation Liquidating Trustee and any Claim in respect of such Distribution shall be disallowed and forever barred from assertion against the Debtors or the Post-confirmation Liquidity Trustee, or their respective property.

Plan XVI.J (**emphasis** in original).

As its subheading suggests, Art. XVI.J relates to withholding and tax reporting *requirements*.[6]  Read as a whole, it permits the Trustee to "require, as a condition to receipt of a

---

[5]    *Coca-Cola Bottling Co. v. Coca-Cola Co.*, 769 F. Supp. 671, 706 (D. Del. 1991) (citing to 4 *Williston on Contracts* § 618 at 710-11).

[6]    It is unlikely anyone would argue with the proposition that conditioning distributions on the receipt of paperwork that is unnecessary is objectionable, even if, in theory, permitted.  It is doubtful this was the

Distribution" that the recipient "complete and return a Form W-8 or W-9 *to the extent those forms are necessary for him to fulfill his withholding and tax reporting requirements*. Otherwise put, if those forms are not a requirement, i.e., optional, this Plan provision does not authorize the Trustee to condition distributions on their completion and receipt.[7]

No allegation has been made that the Trustee will, or could, determine each distribution recipient's tax liability and withhold taxes from the distribution he intends to make.[8]  In fact, the Plan specifically provides that the Trust and its beneficiaries each are responsible for their respective tax reporting obligations.  Plan XVI.J ("each Holder of an Allowed Claim or Allowed Equity Interest that is to receive a Distribution under the Combined Plan and Disclosure Statement

intent of the parties in drafting the Plan.  *See Coca-Cola Bottling Co.*, 769 F. Supp. at 705) ("When interpreting a contract, the primary function of the Court is to ascertain the intention of the parties.") (citing to 4 *Williston on Contracts* § 601 at 303-05).

[7]     The Trustee did not request any tax or other forms in connection with the Initial Equity Distribution, and has, despite repeated requests for an explanation as to why forms suddenly supposedly are required dodged all questions in this regard.  *See, e.g.* Hr'g Tr. 64:10-22 (Trustee stating no forms were requested in connection with the initial distribution and his counsel specifically instructing him, on the basis of attorney-client privilege, not to answer what change in law or fact requires forms in connection with future Plan distributions).  The Trustee has merely asserted that 26 CFR §§ 1.671-4 requires him to comport with applicable tax laws and regulations, which is true but does not support his contention that he needs W-9 Forms from each OTC DNIB shareholder. *See* Reply ¶¶ 14-26.
        The Trustee has not articulated any change in those tax laws and regulations that permitted him to make the Initial Equity Distribution and the time he distributed the Shareholder Notice.  The only logical inference is that the Initial Equity Distribution either (1) was made in violation of applicable tax regulations (which would subject the Trustee to liability under applicable Plan documents, etc.) or (2) that the request for W-9 and Equity Distribution Forms has no logical (or legal) basis.

[8]     To accurately do so, he would need additional information not requested on the Equity Distribution Form. For example, in order for the Trustee to accurately assess each beneficiary's tax liability, he would need to know information about the tax status of the accounts into which each shareholder intends to disburse the distribution check.  *See* Reply ¶ 33 n.19.  Also, because non-dividend distributions are not taxed until the basis in the stock is fully recovered, the Trustee would need to know each shareholder's basis in the stock. Liquidating distributions are not subject to back withholding requirements under 26 U.S.C. § 3406(a)(1), (b)(2), because such payments are considered a return of capital (not dividends). *See* IRS Publication 550, Inv. Income and Expenses (2015), available at https://www.irs.gov/pub/irs-pdf/p550.pdf ("Any liquidating distribution you receive is not taxable to you until you have recovered the basis of your stock"); 26 U.S.C. §§ 331-34 (regarding liquidating distributions).  The Trustee does not have, and did not request, information that would allow him to accurately calculate and withhold taxes from each beneficiary's pro-rata distribution.  Moreover, the Trustee will issue grantor letters to the beneficiaries, which indicates that he is counting on them to pay their respective taxes to the IRS.

shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder").  This is consistent with § 13.2 of the Liquidating Trust Agreement 13.2, which provides that, once a year, "the Liquidating Trustee shall prepare and distribute a statement setting forth the information necessary for each Liquidating Trust Beneficiary to determine its share of items of income, gain, loss, deduction or credit for United States federal income tax purposes" (i.e., a grantor letter).[9]

The only remaining potential basis for requiring a W-9 Form under Art. XVI.J, then, is that it is required for tax purposes.  This requirement is not met if there are alternative reporting methods not requiring the individual shareholders' W-9's because, if there are alternatives, the W-9 Form, by definition, is optional.

### C. Section 4.1(f) of the Liquidating Trust Agreement Does Not Provide the Trustee with Authority to Demand the Tax Forms and Certifications Because the Trustee is Not Withholding Taxes

The Bankruptcy Court concluded that section 4.1(f) of the Liquidating Trust Agreement legitimizes the Trustee's document requests. Mem. Op. ¶¶ 5 & 7; *cf.* Opposition ¶ 13 (arguing that section 4.1(f) authorizes the Trustee to condition distributions on receipt of the W-9 and Equity Distribution Form under the circumstances).  This conclusion, which is reviewed *de novo*, was legally incorrect.

Section 4.1(f) only authorizes the Trustee to request tax forms to the extent they are necessary for him to meet his "obligations to withhold."[10]  As previously noted, the Trustee will

---

[9]     *Cf.* Liquidating Trust Agreement § 8.2(a) ("For all federal income tax purposes, all Parties and Liquidation Trust Beneficiaries shall treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in this Article VIII and in the Plan, as a transfer of such assets by the Debtors to the Liquidation Trust Beneficiaries entitled to distributions under this Agreement followed by a transfer by such Liquidation Trust Beneficiaries to the Liquidation Trust.  Thus, the Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.").

[10]     The Liquidating Trust Agreement, at § 4.1(f), provides:

not be withholding taxes from distribution recipients. *See supra*, 26 U.S.C. § 3406(a)(1) & (b)(2); IRS Publication 550, Inv. Income and Expenses (2015) ("Any liquidating distribution you receive is not taxable to you until you have recovered the basis of your stock") (available at https://www.irs.gov/pub/irs-pdf/p550.pdf); 26 U.S.C. §§ 331-34. Consequently, section 4.1(f) cannot form the basis for the Trustee's W-9 or Certification demands.

Further, the existence of alternative avenues for the Trustee to satisfy his tax reporting obligations[11] make the avenue the Trustee has chosen fail the "reasonably request" standard contained in section 4.1(f) of the Liquidating Trust Agreement. By his own estimates, conditioning future distributions on receipt of a W-9 Form will result depriving nearly a quarter of Distribution Record Date shareholders of the distributions to which they are entitled.[12] For a form that is optional, these casualties are not "reasonable," and the Trustee's request therefore violates the Plan.

**D. Interpreting Operative Plan Documents as Authorizing the Trustee to Condition Distributions to Holders of DNIB Stock in Street Name on Tax Documents and Certifications Would Render the Provisions in those Documents Relating to the Debtor's Transfer Agent Meaningless**

---

> The Liquidation Trustee is authorized to request and obtain from the Liquidation Trust Beneficiaries or any other Person Forms W-8 and/or W-9 or such other forms or information relating to the Liquidation Trustee's obligations to withhold as the Liquidation Trustee may reasonably request.

[11]   *See* Reply ¶¶ 14-26. The Trustee can satisfy tax reporting requirements by complying with 26 C.F.R. § 1.671-4(b)(3), an optional reporting method expressly permitted by 26 C.F.R. § 1.671-4(a) for trusts treated as owned by two or more grantor-beneficiaries. Alternatively, he can satisfy tax reporting requirements under 26 C.F.R. § 1.671-4(a) by relying on the Form W-9 provided by the Debtor's transfer agent or nominees, as other liquidating trusts do and have done. Neither reporting method requires the collection of Form W-9s from trust beneficiaries.

[12]   It is difficult for B.E. Capital to quantify how many shareholders will be deprived of their distributions by the Trustee's proposed distribution mechanism. This is so because B.E. Capital has no way of identifying how many shareholders are affected because pink sheet shareholders ordinarily remain anonymous, since their brokers make trades for them. B.E. Capital's best evidence in this regard is the Trustee's tally of how many shareholders have agreed to give up their anonymity by sending in the Tax Forms.

Principles of contract construction and interpretation further compel the conclusion that the Plan documents do not permit the Trustee to condition distributions to OTC DNIB stockholders on the completion of any tax or other documentation.  The Bankruptcy Court's contrary conclusion would render all provisions in the Plan and Liquidating Trust agreement relating to the Debtor's transfer agent meaningless and frustrate the intent of the parties at the time the Plan was proposed.

The Plan is a contract that is to be interpreted using established principles of contract law. *See In re AMR Corp.*, 562 B.R. 20, 28 (Bankr. S.D.N.Y. 2016) ("When interpreting a confirmed plan, the principles of contract law apply. For purposes of interpretation, all documents which were confirmed together to form the contract are added to the plan itself.") (internal citations and quotations omitted).[13]  Those principles require that Plan provisions not be examined in a vacuum, but by reference to other provisions.  *See, e.g.*, *Pac. Emplrs. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012) ("we must examine the entire contract . . . all provisions in the agreement will be construed together and each will be given effect because a court will not interpret one provision . . . in a manner which results in another portion being annulled.") (internal citations and quotations omitted); Restatement (Second) of Contracts, § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").[14]

---

[13]     The Plan and Liquidating Trust Agreement are governed by Delaware law.  Plan XVI.I; Liquidating Trust Agreement 18.1

[14]     B.E. Capital had the following exchange with the Bankruptcy Court at the Hearing:

> THE COURT: Doesn't the plan directly say that the trustee has the right to require the submission of a W-9?
>
> MS. KLEIN: It does say that, but that provision also has to be read in conjunction with another plan provision, which specifically requires the trustee to make distributions to holders in street name through the DTC. And if you read those two in conjunction, there's absolutely no reason why the trustee would need a W-9 form.

Further, the Plan is to be construed in such a way as to give meaning to all of its provisions, not in a way that renders some of its provisions redundant and meaningless. *See Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 56 A.3d 1072, 1126 n.208 (Del. Ch. 2012) ("[A]n interpretation which gives a reasonable ... and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable ... or of no effect."); *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) ("Delaware courts have consistently held that an interpretation that gives effect to each term of an agreement is preferable to any interpretation that would result in a conclusion that some terms are uselessly repetitive. Contracts are to be interpreted in a way that does not render any provisions illusory or meaningless.").

Finally, in construing the meaning of a contract, a court "should give effect to the mutual intention of the parties at the time the contract is executed. The Court should put itself in the position of the parties, looking forward from the time they entered into the contract. The Court should not view the contract from a position of hindsight." *Coca-Cola Bottling Co*, 769 F. Supp. at 705-06. *Cf.* Restatement (Second) of Contracts, § 202(1) (1981) ("Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight.").

Applying the foregoing principles of contract law, the Bankruptcy Court's holding was clearly erroneous. First, permitting him to condition distributions on certain information returns, the Court condoned the Trustee's manual distribution mechanism to OTC DNIB stockholders. This renders Art. X.K of the Plan illusory, which provides that "Distributions to . . . Allowed

---

Hr'g Tr. 11:11-18. The Mem. Op. does not address how the Trustee's document requests square with the Plan's requirement that distributions to OTC DNIB shareholders be made through the Debtor's transfer agent.

Equity Interests shall be made. . . through the transfer agent for BIND Equity Interests."[15]  It also makes section 4.2 of the Liquidating Trust Agreement meaningless, governing "Delivery of Distributions, which states that "distributions and deliveries to the Liquidation Trust Beneficiaries shall be made at the address of each such Liquidation Trust Beneficiary set forth on the [records of] the transfer agent for the Debtors' Equity Interests."  Had the Plan, or the parties thereto, envisioned the Trustee simply substituting his own shareholder registry for that of the Debtor's transfer agent and the automatic computerized process for his manual distribution, there would have been little reason to include these provisions in the Plan.

Second, permitting the Trustee to collect information from OTC DNIB stockholders makes Paragraph 20 of the Confirmation Order ring hollow, which provides that "In making any Distribution with respect to any Claim or Equity Interest, the … Trustee shall be entitled … to recognize and deal with, for all purposes hereunder, only the Entity that … is listed on the Debtors' books and records or on a record maintained by the Debtors' transfer agent as having been the Holder of an Equity Interest on the Distribution Record Date."  The OTC DNIB shareholders do not appear in the Debtors' books and records, because they never filed proofs of claim and the

---

[15]      The Manner of distributions under the Plan differs among creditor constituencies:  (1) creditors who filed proofs of claim or proofs of interest (for shareholders who held the Debtors' stock *directly*) will receive their distributions directly from the Trustee at the address indicated; (2) creditors who filed address change requests will receive their distributions directly from the Trustee at their new address; (3) creditors that the Debtors included in their Schedules E/F (unsecured, including priority, debt) will receive distributions directly from the Trustee at the addresses maintained in the Debtors' books and records; and (4) to shareholders that held the Debtors' stock *in street name* (i.e., through a broker, or nominee) are supposed to receive their distributions through the Debtors' transfer agent.  The Trustee did precisely that when he made the Initial Equity Distribution.  *See* Plan X.K (providing that distributions "*shall* be made" in one of the four specified ways).  Because, by his own admission, Opp. ¶¶ 26 & 28, the Trustee does not know the identity of shareholders that held the Debtors' stock in street name—because they would not have filed proofs of claim or interest, nor address change requests, nor would they appear anywhere in the Debtors' books and records, including the Schedules—it is clear that methods (1)-(3) of section X.K of the Plan do not apply, and that, at the time the Plan was proposed and confirmed, it was the intent of the parties that the Trustee *must* use the fourth method, the Debtor's transfer agent, to make distributions to pink sheet shareholders.

15

Trustee does not know who they are.[16]  It also renders meaningless section 9.1 of the Trust Agreement governing "Identification of Liquidation Trust Beneficiaries," which directs the Trustee to "conclusively rely on the names and addresses set forth [i]n [the records of] the Debtors' stock transfer agent."

Third, permitting the Trustee to condition it on tax forms and Certifications information returns guarantees that the Debtor's transfer agent will not be making the next distribution to shareholders who held DNIB stock in street name.[17]  There can be no dispute this will frustrate the intent of the parties at the time the Plan was proposed and confirmed.  That the Trustee made the Initial Equity Distribution to street name shareholders through the Debtor's transfer agent demonstrates that this was the intent of the parties and operative Plan documents at the time they were approved by the Bankruptcy Court.

Implicit in this understanding was that the Trustee would not be requesting any tax or other forms from street name shareholders, because, so long as distributions were made through the transfer agent, such forms would not be required from the individual OTC shareholders, because they would not be receiving distributions directly but through the Debtor's transfer agent and their respective brokers.  (The brokers keep the shareholders' W-9 Forms on file and issue yearly 1099 Forms to them.)   Consequently, Plan section XVI.J, which permits the Trustee to condition distributions on receipt of W-9 Forms (but not nominee Certifications) where such forms are *required* for him to comply with applicable withholding and tax reporting obligations, was not

---

[16]     Opp. ¶ 10. Contrary to the Trustee's previous assertion, newly-collected information does not form part of the "books and records" that existed at Plan confirmation.  Hr'g Tr. 31:10-4.

[17]     This is so because the DTC has indicated it will not make a distribution to less than all OTC DNIB stockholders.  Status Report [D.I. 642] ¶ 10.  In instituting the forms requirement, the Trustee guaranteed that not all OTC DNIB stockholders who received the Initial Equity Distribution will receive a future Plan distribution.

objectionable at the time the Plan was proposed and confirmed.  Everything worked as Planned in connection with the Initial Equity Distribution, in connection with which no forms were required. *See* Hr'g Tr. 63:7-19.[18]

The Trustee's proposed revised distribution mechanism runs counter to both the intent that distributions to OTC DNIB shareholders be made through the transfer agent[19] and that no tax or other identifying information be requested from OTC DNIB shareholders.[20]

---

[18]     [Trustee's Direct Examination] BY MS. KLEIN:

> Q. Did the -- to your knowledge, did the trust request W-9 forms in connection with the initial equity distribution?
>
> A. No, I did not.
>
> Q. Did the trust request equity distribution forms in connection with that initial distribution?
>
> A. We did not request any forms from the shareholders of record for the initial distribution per the terms of the plan.
>
> Q. Did you request tax information from the transfer agent or the DTC in connection with that initial equity distribution?
>
> A. As I just stated, we did not ask for any reporting forms, tax information, W-8, W-9, or certification forms from DTC or Cede & Co. for any shareholders for the first distribution.

[19]     Besides depriving Distribution Record Date shareholders from distributions to which they are entitled, there also are drawbacks to the proposed manual distribution to shareholders that will receive a distribution check.  For example, if distribution checks are not made out correctly (and they invariably will not be, because the Trustee has not requested sufficient information from each shareholder to make them compliant), a shareholder will lose the ability to reinvest the distribution funds through its broker into a tax-sheltered account, resulting in unintended tax liability to the shareholder.

[20]     A distribution made through the DTC/transfer agent preserves the identity and other personal information of the individual investors, who have a nominee or broker trading on their behalf.

## CONCLUSION

For the foregoing reasons, B.E. Capital respectfully requests that the Mem. Op. be reversed and remanded to the Bankruptcy Court with instructions to direct the Trustee to make any future distributions on account of former OTC DNIB stock through the Debtor's transfer agent.

Respectfully submitted,

Dated: August 28, 2017
      Wilmington, Delaware

**KLEIN LLC**

*/s/ Julia Klein*
Julia B. Klein (DE 5198)
919 North Market Street
Suite 600
Wilmington, Delaware 19801
(302) 438-0456
klein@kleinllc.com

*Counsel for B.E. Capital Management*
*Fund LP and the Putative Class*

18